## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **EDWARD SPACER,** individually, and on behalf of others similarly situated, | Case No.: |
| Plaintiffs, | Hon.: |
| vs. | |
| **AMERICAN CUSTOMER CARE, INC., and PREMIERE RESPONSE, LLC** | |
| Defendants. | |
| | **February 23, 2024** |

## COLLECTIVE AND CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Edward Spacer ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, hereby brings this Class and Collective Action Complaint against Defendants AMERICAN CUSTOMER CARE, INC. ("ACC") and PREMIERE RESPONSE, LLC ("PREMIERE") (collectively "Defendants"), and, in support thereof, states as follows:

## INTRODUCTION

1.    This is a collective action brought pursuant to 29 U.S.C. § 216(b) arising from Defendants' willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and for common law breach of contract and unjust enrichment.

1

2.      According to its website, "[f]or more than 25 years [Defendant] American Customer Care has been providing contact center services to companies of all sizes[1]." ACC's "main business focus is providing out-sourced, high quality customer contact services to those companies looking to reach new customers as well as communicate and solidify their relationship with existing customers[2]." ACC's "clients include many of the best known brand names in the world across a wide variety of industries." *Id.*

3.      According to its website, *"[a]s a division of [Defendant] American Customer Care, [Defendant] Premiere Response offers clients the high-touch boutique experience its known for with a vast network of resources behind it. With 6 domestic locations across the United States and global partnerships in Europe and South/Central America, American Customer Care provides a solid infrastructure for growth and innovation with a global reach[3]."* Defendant Premiere "provides customer service solutions through inbound and outbound phone, chat, email, text, and social media[4]."

4.      Beyond the six call centers across five states, Defendants employ remote customer center representatives ("CSRs") throughout the country, including Plaintiff who is situated in Georgia.

---

[1] *See,* http://www.americancustomercare.com/about.php (last visited 2/20/2024).
[2] *See,* http://www.americancustomercare.com/industryfocus.php (last visited 2/20/2024)
[3] *See,* https://www.premiereresponse.com/what-we-do/customer-care/ (last visited 2/20/2024)
[4] See, https://www.premiereresponse.com/what-we-do/customer-care/ (last visited 2/20/2024)

5.    Although Defendants provide CSRs with a variety of internal job titles (for example "Customer Experience Relations Representative"), the off-the-clock work claims discussed herein are essentially the same for all CSRs.

6.    The U.S. Department of Labor ("DOL") recognizes that call center jobs, like those held by Defendants' CSRs, are homogenous, and in July 2008, the DOL issued Fact Sheet #64 to alert call center employees to some of the abuses which are prevalent in the industry.  *See* DOL Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA).[5]

7.    One of those abuses, present in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." *Id*. at p. 2.

8.    More specifically, DOL Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails." *Id.* Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept." *Id*.

9.    Defendants require their CSRs to work a full-time schedule, plus

---

[5] https://www.dol.gov/whd/regs/compliance/whdfs64.pdf (accessed February 22, 2024)

overtime, however, Defendants do not compensate CSRs for all work performed.

10.    Defendants require their CSRs to perform compensable work tasks off-the-clock before and after their scheduled shifts and during their unpaid meal periods.

11.    This policy results in CSRs not being paid for all time worked, including overtime.

12.    In the course of performing their job responsibilities, Defendants' CSRs use multiple computer networks, software programs, applications and phone systems.

13.    The time CSRs spend booting up and logging into these programs and applications before, during and after their shifts is compensable because the programs and applications are an integral, indispensable and important part of the CSRs' work, and they cannot perform their jobs effectively without them.

14.    Upon information and belief, Defendants' CSRs all perform essentially the same tasks and are required to use the same or similar computer programs, software programs, applications and phone systems.

15.    Upon information and belief, Defendants' CSRs all follow the same timekeeping process and are subject to the same relevant timekeeping and attendance policies.

16.    Plaintiff seeks to represent in this action all current and former CSRs

who are similarly situated to each other in terms of their positions, job duties, pay structure and Defendants' violations of federal and state law.

17.     Plaintiff's internal job title was "Consumer Experience Relations Representative," but other CSRs experienced the same or substantially similar off-the-clock work.

18.     Defendants knew or should have known how long it takes CSRs to complete their off-the-clock work, and Defendants could have properly compensated Plaintiffs and the putative Collective and Class for this work, but did not.

19.     Defendants knew or should have known that CSRs, including Plaintiff, worked overtime hours for which they were not compensated. Indeed, Defendants' Human Resources Manager wrote to Plaintiff:

> As Rosie has told you, and I am reminding you that after conferencing with Wendy , she wanted to remind you that your shift begins at 845 am and you MUST be ready to take calls. It does not matter how long you take logging in or getting into the systems. You have repeatedly asked Bill Ford,the trainer,and the management team. WE DO NOT AND WILL NOT PAY FOR ANY ADDITIONAL BOOT TIME TO LOG IN. NO KATTER HOW LONG IT TAKES ,it is your responsibility to be up and ready for calls by your shift start.

20.     Plaintiff seeks a declaration that his rights, and the rights of the putative

Collective, were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties and an award of attorneys' fees and costs to make him, and the Collective whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendants to such illegal conduct in the future.

## JURISDICTION

21.    This Court has subject matter jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under 29 U.S.C. § 201, *et seq.*

22.    Additionally, this Court has jurisdiction over Plaintiff's FLSA claims pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

23.    Moreover, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

24.    This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 Class members, and at least some members of the proposed class have a different citizenship than Defendants.

25.    Defendants' annual sales exceed $500,000 and Defendants have more

than two employees, so the FLSA applies in this case on an enterprise basis.

26.    Defendants' CSRs, including Plaintiff, engage in interstate commerce or in the production of goods for commerce and therefore they are also covered by the FLSA on an individual basis, by virtue of their regular and routine use of phone lines in the performance of their job duties.

27.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they are so closely related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

28.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

29.    This Court has personal jurisdiction over Defendants because they conduct business within the state of Connecticut, have their principal place of business and headquarters in Connecticut, are registered with the Connecticut Secretary of State and employ individuals within the state of Connecticut.

30.    This Court also has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting activities in the state of Connecticut, have established minimum contacts sufficient to confer jurisdiction over them and Defendants' principal place of business is in this district and division; and the assumption of jurisdiction over Defendants will not offend

traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

## VENUE

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants conduct substantial business activities within this District and Defendants maintain their principal place of business in this District.

32.     Pursuant to 28 U.S.C. § 1391(b)(1) venue is proper in this District because all Defendants are residents of Connecticut and reside in this District.

## PARTIES

33.     Plaintiff EDWARD SPACER ("Plaintiff") is a Georgia resident who worked for Defendants as a remote CSR in Georgia within the last three years.

34.     Defendants paid Plaintiff for his services in the form of an hourly wage, for all credited hours worked, most recently at the rate of $11.50 per hour.

35.     Plaintiff signed a consent to join this collective action lawsuit. Exhibit 1, Spacer Consent to Join.

36.     Defendant Premiere Response, LLC is a foreign corporation registered with the Secretary of State of Connecticut (Business ALEI: US-CT.BER:1315728) with its principal office address located at 400 Executive Blvd South, 1st Floor Southington, CT 06489.

37.     Defendant American Customer Care, Inc. is a foreign corporation

8

registered with the Secretary of State of Connecticut (Business ALEI: US-CT.BER:1158081) with its principal office address located at 400 Executive Blvd South, 1st Floor Southington, CT 06489.

## JOINT EMPLOYMENT ALLEGATIONS

38.    Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

39.    The definition of "employer" under the FLSA is not limited to the common law concept of "employer," and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. *Real v. Driscoll Strawberry Assocs*., 603 F.2d 748, 754 (9th Cir. 1979).

40.    Congress defined "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), describing this language as "the broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (*quoting* 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo Black)); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 300 n.21 (1985) (same).

41.    The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The

touchstone is "economic reality." *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961).

42.    Two or more employers may jointly employ someone for purposes of the FLSA. *Falk v. Brennan*, 414 U.S. 190, 195 (1973).

43.    All joint employers are individually responsible for compliance with the FLSA. 29 C.F.R. § 791.2(a) (1981).

44.    Regulations issued by the Department of Labor give the following examples of joint employment situations:

> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b) (footnotes omitted).

45.    The ultimate question of whether a party is an "employer" is a legal issue. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983). The ultimate determination must be based "upon the circumstances of the whole activity." *Id*. at 1470 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947).

46.    At all relevant times, Defendants controlled the rate and method of payment for the employees (including remote CSRs); controlled and dictated their

schedule and job duties; and otherwise, exercised control, input, and responsibility for the work hours, compensation and pay policies at issue in this case. Thus, all Defendants meet the test for joint employer. For example, the training that Plaintiff and other CSRs received was jointly provided by Defendants:

Good afternoon, everyone!

My name is Cooper Gaudiosi, and I have the privilege of being one of your Learning Facilitators for the upcoming training. I'm incredibly excited to start working together and I hope you all feel the same. You will likely receive a couple of emails from different people here at American Customer Care/Premiere Response (ACC/PR), as we are all looking forward to meeting you. All the information you receive from us should be consistent; however if there are any questions please do let us know. You will also receive a phone call to verify some information from one of our team members.

You will receive a link with the time for orientation that will be held on Tuesday 9/19. Once orientation, and all paperwork is complete, we will provide you with equipment. **You will not receive equipment until orientation, and all paperwork, is completed**.

We understand that we are all distant from our home offices and we should have discussed shipping equipment with you already. We will follow up with tracking numbers so that you can plan for the delivery and sign for the equipment.

The actual training will begin on Monday, 9/25, at 9:00am EST. We will start the morning with a Tech Session where we confirm that you have all of the necessary equipment and walk you through the set-up. We will be using the Zoom link below for the Tech Session and the training sessions each day after

47.    Defendants required Plaintiff and other CSRs to acknowledge job

related policies and procedures including the joint "Hourly Employee Separation Compensation" policy, which confirms the two entities are one "Company" for purposes of employee matters:



**Hourly Employee Separation Compensation**

I understand that staffing is vital to American Customer Care's and Premiere Response's ability to service its clients. I understand that in order to ensure proper staffing, I must give 2 weeks' notice of resignation and work - all scheduled hours during those 2 weeks. I also understand that if I provide such notice, the Company can choose to expedite my resignation or, if there is a compelling circumstance and I wish to leave earlier, allow me to leave earlier without penalty.

In addition, I acknowledge and understand, that due to the importance of providing 2 weeks' notice, if I resign with less than 2 weeks' notice, - any hours not yet paid will be paid, to the maximum extent permitted by law, at the applicable minimum wage rate and not my standard hourly rate of pay.

48.     Additionally, a cursory review of the websites maintained by Defendants further confirms that they are interconnected and share responsibilities related to their employees. Compare: https://www.premiereresponse.com/ with http://www.americancustomercare.com/

49.     Defendants even use the exact same website to recruit employees and to post their open positions: https://www.experiencesreimagined.com/ The postings on this website refers to both Defendants and markets "Our Team At American

Customer Care."

50.    Whether employers, or joint employers, each Defendant is nevertheless liable for the wage violations pleaded in this Complaint. *Falk*, supra; 29 C.F.R. § 791.2(a).

51.    At all times herein mentioned, Defendants' acts and omissions proximately caused the complaints, injuries, and damages alleged herein.

## COMMON ENTERPRISE ALLEGATIONS

52.    The FLSA provides, in relevant part, that the term, "[e]nterprise means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all activities whether performed in one or more establishments ...." 29 U.S.C. § 203(r).

53.    The three elements to be satisfied are: (1) related activities, (2) unified operation or common control, and (3) common business purpose. *See*, *Brennan v. Arnheim & Neely*, 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973).

54.    The Defendants meet all three elements.

55.    Related activities are those which are "the same or similar," S.Rep. No. 145, [8]7th Cong. 1st Sess. 41, reprinted in 1960 U.S.Code Cong. & Ad. News 1620, or are "auxiliary or service activities." 29 C.F.R. § 779.206(a) (quoting id.). Auxiliary and service activities include generally "all activities which are necessary to the operation and maintenance of the particular business," such as warehousing,

bookkeeping, or advertising. *Id*.; *see also id*. at § 779.208. When different business entities are involved, the critical inquiry is whether there is "'operational interdependence in fact.'" *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir.1984) (*quoting Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1367 (5th Cir.1973)). Entities which provide mutually supportive services to the substantial advantage of each entity are operationally interdependent and may be treated as a single enterprise under the Act. *Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 692–93 (4th Cir.1990).

56.    In the present case, Defendants are operationally interdependent because they share ownership, management, employees, and employment policies.

57.    The Secretary's regulations define "unified operation" as "combining, uniting, or organizing [related activities'] performance so that they are in effect a single business unit or an organized business system which is an economic unit directed to the accomplishment of a common business purpose." 29 C.F.R. § 779.217. "Control" is the power to "direct, restrict, regulate, govern, or administer the performance" of the related activities, and "common control" exists "where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together." *Id*. § 770.221.

58.    As explained herein, the Defendants maintain a unified operation with

common ownership and control of the remote CSRs. Further, the Defendants maintain the power to direct, restrict, regulate, govern or administer the performance of all remote CSRs' work activities. Additionally, Defendants maintain the power to hire, discipline, and fire the employees (including remote CSRs). Finally, as it pertains to this case, Defendants dictate the compensation policies and procedures of the remote CSRs.

59.    "'Common control' may exist … despite the separate management of the individual establishments." *Dole v. Bishop*, 740 F.Supp. 1221, 1225 (S.D.Miss.1990) (citing *Shultz v. Morris*, 315 F.Supp. 558, 564 (M.D.Ala.1970), *aff'd sub nom.*, *Hodgson v. Morris*, 437 F.2d 896 (5th Cir.1971)).

60.    Finally, obviously enough, the Defendants all share in the common business purpose of advancing and growing their financial services business.

## **GENERAL ALLEGATIONS**

61.    Defendants employed Plaintiff as a remote CSR from Plaintiff's home offices within the last three (3) years.

62.    Defendants' CSRs are responsible for, among other things: (a) booting up their computers and logging into several essential computer software programs and applications, as well as Defendants' phone system, before fielding phone calls; (b) taking in-bound calls from and making out-bound calls to individuals who need assistance; (c) ensuring that every call is documented and accounted for in

Defendants' system; (d) reading emails daily with work instructions; and (e) logging out of the computer software programs and applications and the phones and shutting down their computers.

63.    Defendants' CSR jobs are hourly, non-exempt positions with rigid schedules that require CSRs, including Plaintiffs, to work at least eight (8) hours per day, on average five (5) days each week, and up to forty (40) hours or more in a workweek.

64.    These schedules result in CSRs routinely working overtime on a weekly basis.

65.    Indeed, throughout his employment with Defendants, Plaintiff was required to work a substantial amount of unpaid time, including overtime, as part of his role as a CSR.

66.    At all relevant times, Defendants controlled their CSRs' work schedules, duties, protocols, applications, assignments, and employment conditions.

67.    Defendants were also responsible for training and continuing their CSRs' education in their role as CSRs.

68.    Defendants' CSRs all perform essentially the same tasks and are required to use the same or similar computer programs, software programs, applications, and phone systems.

69.    These programs, applications and systems are integral and an important

part of the CSRs' work, and they cannot perform their jobs without them.

70.    Defendants' CSRs all follow the same timekeeping process, are subject to the same relevant timekeeping and attendance policies, and are subject to quality assurance reviews based on the same or similar criteria.

71.    Defendants expressly instruct and train CSRs to have all of their computer networks, software programs, phone systems and applications open and ready at the start of their scheduled shifts to start fielding phone calls. For example, Plaintiff's Team Leader explained: "With regards to your logging in, you need to be up and ready to take calls at 845am [start of shift]."

72.    CSRs, including Plaintiff, are instructed to only include the time that they are fully prepared to field calls in their hours worked each shift. Indeed, one of Defendants Team Leaders explained: "You cannot spend 15 minutes or so logging in. We do not and will not pay for additional bootup time. You will get paid for the time you work your scheduled shift which is 845 am to 515pm."

73.    Defendants also maintain a written, company-wide policy, that CSRs are to use unpaid time to get ready to field calls before the start of their shifts. That policy was explained to Plaintiff and fellow CSRs as follows:

> You must take the adequate time before your shift whether it is 15 or 20 minutes or whatever it is . It is your responsibility to be logged in to the systems and programs to be able to start taking calls. Again you are not being paid this is your responsibility.

74.     Defendants furthermore enforce their policy of requiring all computer networks, programs and applications be open and ready at the commencement of a CSR's shift, and critically, before they clock in, through their performance metrics and schedule adherence policies.

75.     More specifically, being clocked in but unavailable to take calls for too long can result in poor performance scores and possible disciplinary action, up to and including termination.

76.     Defendants' scoring guidelines measure a CSRs' ability to adhere to mandatory protocols and are comprised of various performance metrics, including but not limited to the CSRs' complete and correct resolution of issues and inquiries.

77.     This performance metric necessarily requires that CSRs be logged into all computer programs, applications and systems, and have all reference materials and available resources open at the time of the call.

78.     Failing to accurately account and pay for all of the time actually worked by employees is a clear violation of the FLSA's record keeping requirements. *See* 29 U.S.C. § 211(c).

79.     Because CSRs are prohibited from including all hours worked in their time recorded, Defendants' compensation policy and system fails to properly account and compensate them for all time worked, including their overtime hours, each day and each workweek.

80.    Thus, the hours reflected on the CSRs' pay stubs are inaccurate and contrived by Defendants.

81.    In fact, as outlined below, Defendants maintain a common plan and policy pursuant to which they fail to pay their CSRs for no less than twenty-one (21) to twenty-nine (29) minutes per day of work performed during pre- and post-shift time and during their lunch periods.

82.    This time could easily be recorded, accounted for and paid, but Defendants chose not to credit such time as time worked.

83.    Additionally, all CSRs working remotely are required to go to the app-store, download "Duo Mobile" on their cell phones in order to "set up" their computers to work from home. CSRs are instructed not to delete the app on their phones because they "will **always** need it to access our company information." After downloading the app, Defendants send the CSRs a text message with a link that directs the to "a page that displays 'American Customer Care' (or 'Premiere Response'). While CSRs are not paid for the time spent initially setting up their computers, other off-the-clock work occurs before, during, and after *every* shift.

### A.    Pre-Shift Off-the-Clock Work

84.    In addition to their regularly scheduled shifts, and as mentioned above, Defendants' CSRs perform pre-shift work tasks for which they are uncompensated.

85.    Pursuant to Defendants' policies, training and direction, Defendants'

CSRs are required to start up and log into various secure computer programs, software programs and applications in order to perform their jobs.

86.    The pre-shift startup and login process takes substantial time on a daily basis with said time averaging fifteen (15) to twenty (20) minutes per day, and the tasks can take longer if CSRs experience technical problems with the computer, software, and/or applications.

87.    Prior to the commencement of each scheduled shift, Plaintiff, as well as the other CSRs, were required to complete the following tasks or tasks substantially similar to the tasks below:

        a.  Turn on their computers;

        b.  Load and log-into Windows;

        c.  Load and log-into Duo Mobile using dual factor authentication[6];

        d.  Load and log-into Control Shield (VPN) with dual factor authentication;

        e.  Load and log-into Okta with dual factor authentication;

---

[6] Dual-authentication is inherently more time consuming than traditional single factor authentication, such as entry of a single password. Dual-authentication requires a user to request that a code be sent to their cell-phone or e-mail, then retrieve the code, and then input the code into the computer system. Unlike a fixed password, the code received is never the same and there is often a lag time between when the code is requested and when it is received.

      f.  Load and log-into Salesforce;

      g.  Load and log-into Zoom;

      h.  Load and log-into Interactive Desktop;

      i.  Finally, load, log-in, and clock into Paycom.

88.    The aforementioned tasks are an integral and essential aspect of a CSR's job duties and responsibilities, as CSRs must have all of the above referenced computer programs, systems, and applications up and running on their computers in order to be prepared to accept incoming calls.

89.    Yet, Defendants fail to compensate CSRs for the computer boot up tasks.

90.    Instead, Defendants maintain attendance policies that require them to be call-ready at the start of their scheduled shift. Additionally, Defendants maintain a schedule adherence policy that requires them to be available for calls for substantially all of their scheduled hours each week.

91.    Defendants also requires CSRs to read emails with work instructions and announcements, which further pressures them into performing off-the-clock work.

92.    Plaintiffs were explicitly told (in writing) by their supervisors that:

> You must take the adequate time before your shift whether it is 15 or 20 minutes or whatever it is . It is your responsibility to be logged in to the systems and programs to be able to start taking calls. Again you are not being paid this is your responsibility.

93.    As a result, Defendants maintain a common plan and policy pursuant to which they fail to pay CSRs for no less than twenty-one (21) minutes per day of work performed in connection with the above pre-shift activities.

### B.    Meal-Period Off-the-Clock Work

94.    Defendants provide their CSRs with one (1) thirty (30) minute unpaid lunch break per shift.

95.    In reality, Defendants routinely require CSRs to perform work during their unpaid lunch breaks.

96.    Under federal law, in order to deduct an unpaid meal period from an employee's compensable time, an employee must be completely relieved of his or her employment duties for the entire meal break. 29 C.F.R. § 785.19(a) states:

> ***Bona fide meal periods***. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be *completely relieved* from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating. (emphasis added).

22

97.     Defendants do not provide CSRs with a bona fide meal period because its policies and procedures require CSRs to return from their lunch early to perform at least part of the boot up process outlined above.

98.     In fact, several of the programs utilized by CSRs automatically log them out if they are idle for more than a few minutes (at lunch), which requires them to undergo some or all the bootup process outlined herein.

99.     On most days, CSRs spend approximately five (5) to seven (7) minutes performing this work during their unpaid meal breaks on most days, however, such time is even greater, when CSRs are required to do a complete reboot.

100.    Defendants' management is aware that this was Plaintiff's and other CSRs' practice to perform these tasks off the clock, and could have paid CSRs for this time, but did not.

## C.    Post-Shift Off-the-Clock Work

101.    Pursuant to Defendants' policies, training and direction, Defendants' CSRs are required at the end of each shift to log out of the essential computer software programs and applications utilized during their shifts.

102.    The shutdown and logout process requires another one (1) to two (2) minutes of off the clock work per shift.

103.    Pursuant to Defendants' policies, training and direction, Plaintiffs and the other CSRs are not allowed begin the shutdown and logout process until their

scheduled shift ends and they complete their last fielded call.

104.    Defendants do not compensate CSRs for all the time spent shutting down and logging out of their essential work systems.

105.    The unpaid off-the-clock work performed after each shift by Plaintiff and all other CSRs directly benefits Defendants, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as CSRs.

### D.    Exemplary Workweek

106.    The FLSA and regular wage violations discussed herein occurred throughout Plaintiff's employment with Defendants; however, as an example of one instance where Defendants failed to pay Plaintiff overtime for hours worked in excess of forty (40) hours (as mandated by the FLSA), Plaintiff identifies one workweek during the period of October 14, 2023 to October 20, 2023. With pre- and post-shift off-the-clock work, Plaintiff should have been paid an additional twenty-one (21) to twenty-nine (29) minutes or more at his overtime rate for each hour worked in excess of forty (40) in the overtime workweek.

107.    The off-the-clock hours at issue herein constitute overtime hours worked in virtually all workweeks.

### E.    Defendants Benefitted from the Uncompensated Off-the-Clock Work

108.    At all relevant times, Defendants directed and directly benefitted from

the work performed by Plaintiff and similarly situated employees in connection with the above-described pre-shift, meal-period and post-shift activities performed by CSRs.

109.    At all relevant times, Defendants controlled the work schedules, duties, protocols, applications, assignments and employment conditions of their CSRs.

110.    At all relevant times, Defendants were able to track the amount of time CSRs spent in connection with the pre-shift, meal-period and post-shift activities.

111.    Defendants failed to do so and failed to compensate CSRs for the off-the-clock work they performed.

112.    At all relevant times, CSRs were non-exempt hourly employees, subject to the requirements of the FLSA.

113.    At all relevant times, Defendants used their attendance, adherence, and timekeeping policies against the CSRs in order to pressure them into performing the pre-shift, meal-period and post-shift off-the-clock work.

114.    Defendants expressly trained and instructed CSRs to perform the above-described pre-shift activities *before* the start of their scheduled shifts, to ensure they were prepared to take calls (i.e., were "phone ready") the moment their shifts began.

115.    At all relevant times, Defendants' policies and practices deprived CSRs of wages owed for the pre-shift, meal-period and post-shift activities they performed.

116.    Because Defendants' CSRs typically worked forty (40) hours or more in a workweek, Defendants' policies and practices also deprived them of overtime pay in many workweeks.

117.    Defendants knew or should have known that the time spent by CSRs in connection with the pre-shift, meal-period and post-shift activities was compensable under the law.

118.    In light of the explicit DOL guidance cited above, there is no conceivable way for Defendants to establish that they acted in good faith.

119.    Despite knowing CSRs performed work before and after their scheduled shifts and during their unpaid meal periods, Defendants failed to make any effort to stop or disallow the off-the-clock work and instead suffered and permitted it to happen.

120.    Unpaid wages related to the off-the-clock work described herein are owed to CSRs at the FLSA mandated overtime premium of one and one-half times their regular hourly rate because CSRs regularly worked in excess of forty (40) hours in a workweek.

## FLSA COLLECTIVE ACTION ALLEGATIONS

121.    Plaintiff brings this action pursuant to 29 U.S.C. § 216(b) of the FLSA on his own behalf and on behalf of:

> *All current and former CSRs who worked for Defendants at any time during the three years preceding the filing of this*

*Complaint up through and including judgment.*

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this definition if necessary.

122.   Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiff and other similarly situated CSRs.

123.   Excluded from the proposed FLSA Collective are Defendants' executives and administrative and professional employees, including computer professionals and outside salespersons.

124.   Consistent with Defendants' policy and pattern or practice, Plaintiff and the members of the FLSA Collective were not paid premium overtime compensation when they worked beyond forty (40) hours in a workweek.

125.   Defendants assigned and/or were aware of all of the work that Plaintiff and the members of the FLSA Collective performed.

126.   As part of their regular business practices, Defendants intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA with respect to Plaintiff and the members of the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

   a.   Willfully failing to pay their employees, including Plaintiff and the members of the FLSA Collective, premium overtime wages for hours worked in excess of forty (40) hours per workweek; and

   b.   Willfully failing to record all of the time that their employees,

including Plaintiff and the members of the FLSA Collective, worked for the benefit of Defendants.

127.    Defendants are aware or should have been aware that federal law requires them to pay Plaintiff and the members of the FLSA Collective overtime premiums for hours worked in excess of forty (40) per workweek.

128.    Defendants' unlawful conduct has been widespread, repeated and consistent.

129.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiff under 29 U.S.C. § 216(b).

130.    The employees on behalf of whom Plaintiff brings this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

131.    The employment relationships between Defendants and every proposed FLSA Collective member are the same and differ only by name, location and rate of pay.

132.    The key issues – the amount of uncompensated pre-shift start-up/log-in time, unpaid meal period time, and the amount of post-shift shut down/log out time owed to each employee – do not vary substantially among the proposed FLSA

Collective members.

133.   Many similarly situated current and former CSRs have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

134.   Court-supervised notice of this lawsuit should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

135.   Those similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

136.   Plaintiff estimates that the proposed FLSA Collective, including both current and former employees over the relevant period, will include hundreds, if not thousands, of workers.

137.   The precise number of FLSA Collective members should be readily available from a review of Defendants' personnel and payroll records.

**<u>RULE 23 NATIONWIDE CLASS ACTION ALLEGATIONS</u>**

138.   Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on his own behalf and on behalf of:

> ***All similarly situated current and former hourly CSRs who worked for Defendants in the United States, at any time during the last three years.***

(hereinafter referred to as the "Rule 23 Nationwide Class").  Plaintiff reserves the right to amend this definition as necessary.

139.   The members of the Rule 23 Nationwide Class are so numerous that joinder of all Rule 23 Nationwide Class members in this case would be impractical. Plaintiff reasonably estimates there are thousands of Rule 23 Nationwide Class members.  Rule 23 Nationwide Class members should be easy to identify from Defendants' computer systems and electronic payroll and personnel records.

140.   There is a well-defined community of interest among Rule 23 Nationwide members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions, include, but are not limited to, the following:

    a.   Whether the pre-shift time that Rule 23 Nationwide Class members spend on start-up/log-in activities prior to "clocking in" for each shift is compensable time;

    b.   Whether the time that Rule 23 Nationwide Class members spend on work activities during their lunch break, such as logging back into computer systems and clocking in is compensable time;

    c.   Whether the time that the Rule 23 Nationwide Class members spend on work activities after they clock out, such as logging out of computer systems and shutting down the computer is compensable time; and

    d.   Whether Defendants' failure to pay the Rule 23 Nationwide Class members for this pre-, mid- and post-shift time at their agreed upon rate constitutes a breach of contract and whether Defendants were unjustly enriched.

141.   Plaintiff's claims are typical of those of the Rule 23 Nationwide Class

in that he and all other Rule 23 Nationwide Class members suffered damages as a direct and proximate result of the Defendants' common and systemic payroll policies and practices. Plaintiff's claims arise from the same pay policies, practices, promises, and course of conduct as all other Rule 23 Nationwide Class members' claims and his legal theories are based on the same legal theories as all other Rule 23 Nationwide Class members.

142.   Plaintiff will fully and adequately protect the interests of the Rule 23 Nationwide Class and has retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nationwide Class.

143.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because, *inter alia*, it is economically infeasible for Rule 23 Nationwide Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

144.   This case will be manageable as a Rule 23 Class action. Plaintiff and his counsel know of no unusual difficulties in this case, and Defendants have

advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

145.    Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *See Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

146.    Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Nationwide Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nationwide Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

### COUNT I
### (29 U.S.C. § 216(b) Collective Action)
### VIOLATION OF FLSA, 29 U.S.C. § 201, *et seq*.
### FAILURE TO PAY OVERTIME WAGES

147.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

148.    At all times relevant to this action, Defendants were engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

149.    At all times relevant to this action, Plaintiff and the FLSA Collective were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

150.   Plaintiff and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

151.   Plaintiff and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

152.   At all times relevant to this action, Defendants "suffered or permitted" Plaintiffs and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

153.   At all times relevant to this action, Defendants required Plaintiff and the FLSA Collective to perform no less than twenty-one (21) to twenty-nine (29) minutes of off-the-clock work per shift, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

154.   In workweeks where Plaintiff and other FLSA Collective members worked forty (40) hours or more, the uncompensated off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of 1.5 times each employee's regularly hourly wage, including shift differentials and nondiscretionary incentive pay where applicable. 29 U.S.C. § 207.

155.   Defendants' violations of the FLSA were knowing and willful.

156.   Defendants knew or could have determined how long it takes its CSRs to perform their off-the-clock work.

157.   Further, Defendants could have easily accounted for and properly compensated Plaintiffs and the FLSA Collective for these work activities, but did not.

158.   The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

## COUNT II
### (Rule 23 Nationwide Class Action)
### Breach of Contract

159.   Plaintiff realleges and incorporate all previous paragraphs herein.

160.   At all times relevant to this action, Defendants had a binding and valid contract with Plaintiff and every other Rule 23 Nationwide Class member to pay each employee for each hour they worked at a pre-established (contractual) regularly hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed on Defendants' behalf.

161.   Defendant expressly promised to pay Plaintiff at a rate of $11.50 per hour for all hours worked, but then breached the contract by stating that Defendant would only pay Plaintiff for some hours worked. More specifically, after Plaintiff and Defendant had a binding and valid contract for Defendant to pay Plaintiff at a rate of $11.50 per hour for all hours worked as a CSR, Defendant breached that

agreement by refusing to pay for the work performed booting up and shutting down the computer, as discussed herein.

162.    Defendants' contractual promises to pay Plaintiff and each Rule 23 Nationwide Class member's applicable hourly rate is evidenced by, among other things, each pay stub issued to Plaintiff and the Rule 23 Nationwide Class members and the offer letters supplied to Plaintiff and the Rule 23 Nationwide Class members.

163.    Upon information and belief, each Rule 23 Nationwide Class member, including Plaintiff, is paid at a fixed, previously agreed up, hourly rate for all hours worked.

164.    Plaintiff and every other Rule 23 Nationwide Class member accepted the terms of Defendants' contractual promises and performed under the contract by doing their jobs and carrying out the work they performed each shift including the unpaid, off-the-clock work that was required of them, accepted by Defendants, and that they performed, in connection with pre-shift and meal period activities, described herein.

165.    By not paying Plaintiff and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the work they performed each shift in connection with the off-the-clock work they performed, Defendants systematically breached their contracts with Plaintiff and each member of the Rule 23 Nationwide Class.

166.   To the extent there is no state law remedy available, Plaintiffs and the Rule 23 Nationwide Class members' remedies under the FLSA are inadequate in this case to the extent Defendants paid them more than the federally mandated minimum wage for less than 40 hours per week.

167.   As a direct and proximate result of Defendants' contractual breaches, Plaintiff and every other member of the Rule 23 Nationwide Class have been damaged (to the extent there is no other state law remedy) in an amount to be determined at trial.

## COUNT III
### (Rule 23 Nationwide Class Action)
### Unjust Enrichment

168.   Plaintiff re-alleges and incorporate all previous paragraphs herein.

169.   This Count is pled in the alternative to Count II, supra, pursuant to Fed. R. Civ. P. 8(d)(2)-(3).

170.   At all times relevant to this action, Defendants promised Plaintiff and every other Rule 23 Nationwide Class member a pre-established regular hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed for the benefit of Defendants.

171.   Plaintiff and every other Rule 23 Nationwide Class member relied upon Defendants' promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

172.   By not paying Plaintiff and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the off-the-clock work they performed each shift, Defendants were unjustly enriched.

173.   Plaintiff and the Rule 23 Nationwide Class members performed off-the-clock work tasks at the request of and without objection by Defendants.

174.   Defendants received and accepted the above-referenced off-the-clock work services from Plaintiff and every other Rule 23 Nationwide Class member and enjoyed the benefits derived therefrom.

175.   Upon information and belief, Defendants used the monies owed to Plaintiff and every other Rule 23 Nationwide Class member to finance their various business ventures or pay their equity owners.

176.   Defendants have been unjustly enriched by the retention of monies received pursuant to the services Plaintiff and the Rule 23 Nationwide Class performed for Defendants' benefit, without having compensated Plaintiff and the Rule 23 Nationwide Class for the same.

177.   Plaintiff and the Rule 23 Nationwide Class suffered detriment due to Defendants' failure to compensate them for the off-the-clock work described herein, in that Plaintiff and the Rule 23 Nationwide Class were deprived of the ability to utilize that time, effort and their resources in a profitable manner.

178.   As a direct and proximate result of Defendants' actions, and to the

extent there is no other state law remedy available, Plaintiff and every other Rule 23 Nationwide Class member suffered damages, including but not limited to, loss of wages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf, on behalf of the putative FLSA Collective, and on behalf of the Rule 23 Nationwide Class requests judgment as follows:

a.     Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

b.     Certifying this action as a class action (for the Rule 23 Nationwide Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiff's state law claims for common law breach of contract and unjust enrichment;

c.     Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all Collective members, and the Rule 23 Nationwide Class members, and permitting Plaintiff to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the Collective and Class members of their rights by law to join and participate in this lawsuit;

d.     Designating Plaintiff as the representative of the FLSA collective action and the Rule 23 Nationwide Class, and undersigned counsel as Class/Collective counsel for the same;

e.     Designating Plaintiff as the representative of the Rule 23 Nationwide Class, and undersigned counsel as Class counsel for the same

f.     Declaring Defendants violated the FLSA and the DOL's attendant regulations as cited herein;

g.    Declaring Defendants' violation of the FLSA was willful;

h.    Granting judgment in favor of Plaintiff and against Defendants and awarding Plaintiff and the Collective, and the Rule 23 Nationwide Class the full amount of damages and liquidated damages available by law;

i.    Awarding reasonable attorneys' fees and costs incurred by Plaintiff in filing this action as provided by statute;

j.    Awarding other pre- and post-judgment interest to Plaintiff on these damages; and

k.    Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, by and through his attorneys, hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above-entitled cause.

Dated: February 23, 2024          Respectfully Submitted,

*s/ Richard E. Hayber (CT 11629)*
**HAYBER, MCKENNA & DINSMORE, LLC**

Richard E. Hayber (CT 11629)
Thomas J. Durkin (CT 30371)
750 Main Street, Suite 904
Hartford, CT 06103
Phone: (860) 522-8888
Email: tdurkin@hayberlawfirm.com
Email: rhayber@hayberlawfirm.com

**ASH LAW, PLLC**
Charles R. Ash, IV (P73877) (*PHV forthcoming*)
402 W Liberty Street

Ann Arbor, MI 48178
Phone: (734) 234-5583
Email: cash@nationalwagelaw.com

**HOOPER HATHAWAY, P.C.**
Oscar Rodriguez (P73413) (*PHV forthcoming*)
126 S. Main Street
Ann Arbor, MI 48104-1903
Phone: (734) 662-4426
Email: orod@hooperhathaway.com

*Counsel for Plaintiff and the*
*Putative Collective and Class Members*